UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES L. LEARY,

        Plaintiff,

    v.                               Civil Action 2:20-cv-1135
                                            Judge James L. Graham
                                            Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, James L. Leary ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income Benefits. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition (ECF No. 9), and the administrative record. (ECF No. 6.) For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

### I.      PROCEDURAL HISTORY

Plaintiff filed his application for Title XVI Supplemental Security Income Benefits on August 22, 2016, alleging that he had been disabled since February 12, 2013. (R. 229.) Following administrative denials of Plaintiff's application initially and on reconsideration, Administrative Law Judge Timothy G. Keller (the "ALJ") held a hearing on September 27, 2018. (*Id.* at 69–76.) However, Plaintiff introduced new evidence at the hearing, so the ALJ continued

the hearing until February 26, 2019.  (*Id.* at 74–75, 37–68.)  At the February hearing, Plaintiff,

represented by counsel, appeared and testified.  (*Id.* at 42–64.)  Vocational expert Jerry Olshefski

(the "VE") also appeared and testified at the February hearing.  (*Id.* at 63–67.)  On March 25,

2019, the ALJ issued a decision denying benefits.  (*Id.* at 15–30.)  On January 2, 2020, the

Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the

Commissioner's final decision.  (R. 1–6.)  Plaintiff then timely commenced the instant action.

(ECF No. 1.)

Plaintiff raises three issues in his Statement of Errors.  (ECF No. 7.)  Plaintiff first argues

that the ALJ erroneously failed to evaluate Plaintiff's mental health impairments under Listing

12.03 (schizophrenia spectrum and other psychotic disorders).  (Pl.'s Statement of Errors at 4–8

ECF No. 7.)  Next, Plaintiff contends that the ALJ's RFC is not supported by substantial

evidence because the ALJ did not properly weigh the medical opinions.  (*Id.* at 8–12.)  Finally,

Plaintiff asserts that the ALJ's finding that Plaintiff's neuropathy was not a severe impairment is

not supported by substantial evidence.  (*Id.* at 12–14.)

## II.    ALJ'S DECISION

On March 25, 2019, the ALJ issued a decision finding that Plaintiff was not disabled

within the meaning of the Social Security Act.  (R. 15–30.)  At step one of the sequential

2

evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 12, 2016, his application date.  (*Id.* at 18.)  At step two, the ALJ found that Plaintiff had the severe impairments of kidney failure with a history of kidney transplant, hearing loss, fibromyalgia, hypertension, depression, anxiety, and intellectual disorder.  (*Id.* at 18–19.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 19–22.)  Specifically, he found that Plaintiff's kidney impairment did not meet Listings 6.04 or 6.05 (chronic kidney disease); that Plaintiff's hearing loss did not meet Listing 2.10 (hearing loss not treated with cochlear implantation); that Plaintiff's fibromyalgia did not approximate any impairment in Appendix 1; that Plaintiff's hypertension did not meet or medically equal any of the 4.00 Cardiovascular Appendix 1 impairments; and that Plaintiff's mental impairments did not meet or medically equal Listings 12.04 (depressive, bipolar, and related disorders), 12.05 (intellectual disorder), or 12.06 (anxiety and obsessive-compulsive

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

disorders). (*Id.*) The ALJ did not expressly consider Listing 12.03 (schizophrenia spectrum and other psychotic disorders).

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

[T]he claimant has the residual functional capacity to lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and/or walk for 4 hours in an 8-hour workday; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch; occasionally crawl; tolerate no exposure to moving machinery or unprotected heights; tolerate occasional exposure to very loud noise; and should avoid group conversations with multiple speakers. Mentally, he is able to understand, remember, and carry out simple repetitive tasks. He can respond appropriately to supervisors and coworkers in a task oriented setting, with only occasional public contact and occasional interaction with coworkers. He can adapt to simple changes and avoid hazards in a setting without strict production quotas.

(*Id.* at 22.)

At step five of the sequential process, the ALJ, relying on the VE's testimony, found that Plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.* at 29–30.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.* at 30.)

## III.     RELEVANT EVIDENCE OF RECORD

The following summarizes the medical evidence relevant to Plaintiff's Statement of Errors.

### A.     Mental Health Symptoms

#### 1.     Plaintiff's Reports and Testimony

On August 22, 2016, Plaintiff filed a report in which he stated he had anxiety, depression, a learning disability, and "other" mental conditions. (R. 262.) In the report, he wrote that he was not currently working because he was not getting along with co-workers. (*Id.* at 263.) In a January 2017 report, Plaintiff stated he had mental conditions, "including emotional or learning

problems." (*Id.* at 282.)  When he filed a report for his appeal in March 2017, Plaintiff again affirmed having mental conditions.  (*Id.* at 290.)

At the February 2019 hearing, Plaintiff testified he was not working because of mental health issues, including "schizoaffective disorder, and depression, anxiety," and that he had trouble getting along with people.  (R. 23, 42.)  He testified that these disorders affected his daily life because "[t]he anxiety, it keeps—that's what keeps me from leaving home.  I get worried about getting into a confrontation with law enforcement, or somebody.  The depression is really bad in the wintertime.  The schizoaffective disorder is—I have a lot of trouble with negative voices, and hallucinations." (*Id.* at 23, 59.)  At first, Plaintiff said he only socialized at group therapy, but later testified that he attended a family reunion, attended "radio meetings," and enjoyed kayaking.  (*Id.* at 24, 48–54.)  Plaintiff further testified that he could only spell three-letter words, but later admitted to filling out a function report with complete sentences and words longer than three letters.  (*Id.* at 23, 60–62.)  Finally, Plaintiff testified that he had difficulty maintaining attention, but could perform repetitive task like "[c]hecking doors, windows, make sure they're locked." (*Id.* at 23, 60.)

### 2. Treatment Notes and Evaluations

In the summer of 2015, Plaintiff reported depressive symptoms to his counselor.  (R. 24, 341–43.)  He also told his counselor he experienced some high anxiety and "could not calm down" in September 2015.  (*Id.* at 345.)  In December 2015, Plaintiff had improved; he told his counselor his anxiety was "the lowest it's ever been." (*Id.* at 349.)  The improvement continued into January 2016, when he told his counselor his anxiety was "not too bad" and that he had not had any major meltdowns.  (*Id.* at 353.)  In February and March 2016, he reported increased worry, but also told his counselor he had made plans to go camping and fishing.  (*Id.* at 355–57.)

5

In September 2015, Daniel DeSalvo, C.N.P. completed a psychiatric evaluation of Plaintiff.  (R. 367–76.)  Plaintiff reported he was depressed, anxious, and irritable.  (*Id.* at 367.)  Mr. DeSalvo found that Plaintiff was only mildly affected in virtually all areas.  (*Id.* at 25, 372–73.)  Mr. DeSalvo's examinations reflect similarly unremarkable findings from November 2015 through March 2016.  (*Id.* at 25, 387–426.)

During the summer of 2016, Plaintiff told his counselor about worsening symptoms, including increased feelings of depression and fear.  (R. 361–65.)  However, Plaintiff's counselor also noted that Plaintiff had made progress, specifically that Plaintiff was "more tolerant and less judgmental," that Plaintiff was "challenging himself," and had "plans to go kayaking."  (*Id.* at 366.)  In August 2016, Plaintiff reported continued worry and discouragement to his counselor.  (*Id.* at 529, 531.)  In mid-September 2016, Plaintiff told his counselor he thought he had bipolar disorder.  (*Id.* at 533.)

In October 2016, Plaintiff was in a "brighter" mood and talked about hobbies.  (R. 535.)  He also told his therapist he would "never complete dialysis again he would rather die [*sic*]."  (*Id.* at 537.)  The next month, he reported suicidal thoughts.  (*Id.* at 24, 539.)  In December 2016, Plaintiff reported some stress over financial troubles.  (*Id.* at 541, 543.)  In January 2017, Plaintiff again said he was depressed and was thinking about doctor-assisted suicide.  (*Id.* at 545.)

In group therapy during the summer of 2016, Plaintiff reported he was "feeling okay" and the therapist noted he "interacted well with others . . . and demonstrated communication skills."  (*Id.* at 443–48.)  In early August 2016, Plaintiff was less talkative during group therapy, but he was still "engaged in [the] discussion" and "in a decent mood."  (*Id.* at 463–68.)  At a group therapy meeting on August 17, 2016, Plaintiff told the group about his struggles with kidney

disease and finances, stating that he was "feeling not good today." (*Id.* at 473–74.) During a meeting at the end of August 2016, Plaintiff "appeared to be depressed." (*Id.* at 479–80.)

In June and August 2016, Mr. DeSalvo completed another unremarkable psychiatric evaluation of Plaintiff. (R. 487–506.) Mr. DeSalvo marked Plaintiff as a "1" or "2," indicating the lowest levels of symptoms, in all but one psychiatric evaluation category. (*Id.* at 492–93, 502–03.) In October 2016, Jason Seckman, C.N.P. completed a psychiatric evaluation of Plaintiff. (R. 559–68.) At this evaluation, Plaintiff had improved: Mr. Seckman marked him as a "1" or "2" in *every* category. (*Id.* at 564–65.) Mr. Seckman conducted similarly unremarkable evaluations of Plaintiff between November 2016 and December 2017. (*Id.* at 25, 569–98, 618–59, 662–94, 705–15.)

In November 2016, Dr. T. Rodney Swearingen completed a consultative examination of Plaintiff. (R. 520–24.) At the exam, Plaintiff reported that he had "crying spells and [got] easily depressed trying to deal with everything." (*Id.* at 522.) Plaintiff further reported that he "gets anxious and nervous feelings at not knowing what to expect, new places, or people," but that he was "likely to be sure to take his meds." (*Id.*) Dr. Swearingen diagnosed Plaintiff with Unspecified Intellectual Disability; Major Depressive Disorder, Recurrent, with Psychotic Features; General Anxiety Disorder; and Obsessive-compulsive Disorder. (*Id.* at 523.)

In March 2017, Plaintiff reported financial troubles to his counselor. (R. 716.) In July, Plaintiff told his counselor he was feeling "more depressed and feeling, hopeless, withdrawn [*sic*]." (*Id.* at 697.) In October 2017, Plaintiff was fixating on an altercation with his brother and sister-in-law from several years before and said he "actually wants to hurt them." (*Id.* at 695.) In June 2018, Plaintiff reported feeling more depressed, which was possibly attributable to his mother's cancer diagnosis. (*Id.* at 25, 798.)

Mr. Seckman conducted periodic evaluations of Plaintiff throughout 2018. (R. 25, 771–81, 786–796, 800–810, 814–24, 828–37.) Overall, these remained unremarkable. (*Id.*)

**B.    Physical Health Symptoms**

**1.    Plaintiff's Reports and Testimony**

On August 22, 2016, Plaintiff filed a report in which he stated he had kidney failure, osteoporosis, high blood pressure, and shortness of breath. (R. 262.) In the report, he wrote that he believed that by November 1996, his conditions had become severe enough to prevent him from working. (*Id.* at 263.) In a January 2017 report, Plaintiff said he had the same physical conditions as he stated in his initial report. (*Id.* at 281.) When he filed a report for his appeal in March 2017, Plaintiff again affirmed having the same physical conditions as he stated in his initial report. (*Id.* at 289.)

At the February 2019 hearing, Plaintiff testified that his worst physical problem was his chronic pain, which he experienced "in the back, and the legs, and hips, and feet." (R. 23, 43–44.) Plaintiff testified that it was difficult for him to do things like washing dishes or shaving, but that he was able to complete those tasks. (*Id.* at 23, 44–45.) Plaintiff testified that his legs felt tired after walking about half a block, but that he was able to drive and carry two bags of groceries at a time. (*Id.* at 23, 45–46.) When asked about his fibromyalgia, Plaintiff testified that he would rate his pain as a seven out of ten, that he had good days and bad days, and that he experienced pain even on good days. (*Id.* at 57–58.) Plaintiff's counsel asked him about neuropathy, and Plaintiff confirmed he had neuropathy. (*Id.* at 58.) On further questioning from the ALJ, Plaintiff admitted he did not know the difference between neuropathy and fibromyalgia. (*Id.*)

2. **Treatment Notes and Evaluations**

The first nephrology treatment notes in the record are from October 2015, when Plaintiff saw Tara M. Bautista, C.N.P. for a kidney transplant follow-up. Plaintiff's kidney transplant occurred over sixteen years before this appointment. (R. 330–34.) In May and November 2016, Dr. David Dembski, Nephrologist, noted that Plaintiff had been stable. (*Id.* 437, 614.) From November 2016 to March 2018, Plaintiff had similarly unremarkable appointments with his nephrologist. (*Id.* at 610–17, 718–28.)

As for Plaintiff's hearing problems, in 2016, Mark Weaver, M.D. performed a consultative examination of Plaintiff and noted that Plaintiff had "some difficulty hearing normal conversations several times in the exam today, even with hearing aids in place." (*Id.* at 510.) In November 2016, Robert S. Pema, D.O. completed a consultative examination of Plaintiff's hearing. (R. at 526–28, 841–44.) Dr. Pema concluded that Plaintiff could hear speech from distances of four to six feet and could understand eighty-eight percent of speech in his right ear and ninety-two percent of speech in his left ear, and that Plaintiff could sustain speech for a normal length of time. (*Id.* at 527, 843.) Belton Hearing completed a medical source statement for Plaintiff in November 2016. (*Id*. at 335–38.) In the statement, Belton Hearing reported that Plaintiff was able to "hear and understand ordinary conversational voice" with the help of hearing aids. (*Id.* at 336.)

As for Plaintiff's hypertension, Plaintiff has been taking medication for high blood pressure since 2015. (*See* R. 333, 603, 610, 718, 756, 760, 764, 892, 896.) Throughout 2015, 2016, 2017, and 2018, Plaintiff's blood pressure was well-controlled. (*Id.*) In 2018, Plaintiff reported that he was not exercising and was not following a low-salt diet. (*See, e.g.*, *id.* at 26, 756.)

Regarding Plaintiff's fibromyalgia and chronic pain, Plaintiff reported "chronic achy pain in his neck, back, and legs" during the October 2016 consultative examination with Mark Weaver, M.D. (R. 509.) Dr. Weaver further noted that Plaintiff had

> constant mild involuntary spasm to inspection and palpitation of the upper trapezius and lumbar musculature with multiple trigger points palpitated in these muscle groups (in addition to those palpitated in upper and lower extremities total greater than 11/18 for probable fibromyalgia syndrome).

(*Id.* at 511–12.) Plaintiff occasionally reported pain to various providers in 2015 and 2016. (*See, e.g.*, *id.* at 333 (reporting abdominal pain in 2015), 509 (reporting neck, back, and leg pain in 2016).) In February 2017, Plaintiff reported that his chronic pain had improved with a new medication. (*Id.* at 610.) Plaintiff's medical records indicate that he was being treated for neuropathy, but the progress notes do not discuss what treatments his providers recommended for that condition besides the medication Neurontin. (*See, e.g.*, *id.* at 521, 610, 612, 725, 746, 921, 926.)

During his 2016 consultative examination, Mark Weaver, M.D. described Plaintiff as:

> a well-developed, well-nourished 38-year old male who ambulated with a stiffened gait complaining of lower back, buttock, and leg muscle pain bilaterally. He did not use any ambulatory aids, braces, or other special equipment in the exam today. He did not become short of breath or complain of chest pain after walking 40 feet up and down the hallway in the clinic or after performing physical activities in the exam.

(R. 510.)

## C.    Activities of Daily Living

In August 2016, Plaintiff completed a function report in which he stated he needed to have the same routine and was "afraid of fires. I have to have everything unplug[ed] if I'm not seing it. [*sic*] I lock my doors and windows." (R. 271.) He reported that his hobbies included watching TV and looking at "cool cars and truck[s] onlin[e]" and changing his oil in the summer. (*Id.* at 272.) Plaintiff reported he did not like physical activities "like fish[ing] or hunting . . .

10

like I use[d] to," but that he was still able to change a tire.  (*Id*.)  Plaintiff said he did not socialize outside of group therapy due to his mental health issues.  (*Id.* at 272–73.).  Plaintiff reported that he was able to microwave food for himself, occasionally go to the grocery store, drive a car, and help with chores, but that his conditions affected several abilities including walking, standing, memory, and getting along with others.  (*Id.* at 273–75.)

During a consultative examination with Dr. T. Rodney Swearingen in November 2016, Plaintiff reported he spends his days "waking up between 8 and 10AM [*sic*], sits around, watches some TV, tries to do things but forgets, and goes to bed around 9PM [*sic*]."  (R. 522.)  Plaintiff said he socialized with his parents daily, and the people in his group therapy once a month.  (*Id.*)  Plaintiff reported that his mother did all the household chores.  (*Id.*)

At the February 2019 hearing, Plaintiff testified that he "pretty much stayed home" except for going to therapy.  (R. 49.)  He also talked about going camping on one occasion with his parents.  (*Id.* at 50–51.)  Plaintiff further testified that he worked on cars sometime around 2015 or 2016.  (*Id.* at 56–57.)

## IV.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must  "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that  finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109  F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial  evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to  follow its own regulations and where that error prejudices a claimant on the merits or deprives  the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.  2007).

## V.     ANALYSIS

Plaintiff raises three issues in his Statement of Errors (ECF No. 7): (1) The ALJ failed to evaluate Plaintiff's mental health impairments under Listing 12.03; (2) The ALJ's RFC is not supported by substantial evidence because the ALJ did not properly weigh the medical opinions; and (3) the ALJ's finding that Plaintiff's neuropathy was not a severe impairment was not supported by substantial evidence.  (Pl.'s Statement of Errors at 4–14, ECF No. 7.)  The undersigned will address each of these arguments in turn.

### A.     Listing 12.03

Plaintiff contends that the ALJ failed to properly evaluate his mental health impairment under Listing 12.03 (schizophrenia spectrum and other psychotic disorders) at step three of the

12

evaluation process. (Pl.'s Statement of Errors at 4–8, ECF No. 7.) Plaintiff further argues that, if the ALJ had evaluated his mental health impairment under Listing 12.03, the ALJ would have found his impairment met the Listing and, therefore, would have found Plaintiff was disabled. (*Id.*)

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Plaintiff cites to *Reynolds v. Comm'r v. Soc. Sec.*, 242 F. App'x 411 (6th Cir. 2011), to support his argument that the ALJ's failure to evaluate Plaintiff's mental conditions under Listing 12.03 is reversable error. In *Reynolds*, the ALJ had failed to evaluate a claimant's back pain under any Listing. (*Id.* at 415–16.) The Sixth Circuit found that the ALJ "skipped an entire step of the necessary analysis" and that "the ALJ's error was not harmless, for the regulations indicate that if a person is found to meet a Listed Impairment, they are disabled within the

meaning of the regulations and are entitled to benefits; no more analysis is necessary." (*Id.* at

416.) However, later cases clarified that any failure of the ALJ in evaluating an impairment

under a Listing is harmless if the Plaintiff did not show he met or equaled the Listing. *See, e.g.*,

*Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359 (6th Cir. 2014) (holding that the ALJ's failure

to evaluate claimant's impairments under a Listing was harmless error where claimant did not

show he met or equaled the Listing); *Ison v. Acting Comm'r of Soc. Sec.,* No. 2:16-CV-00464,

2017 WL 4124586, at *6 (S.D. Ohio Sept. 18, 2017) ("Even if the ALJ failed to support its step

three findings, such error is harmless where a claimant fails to show that his [impairments met or

equaled the Listing].").

To establish a disability under Listing 12.03, a claimant must satisfy either paragraphs A

and B or paragraphs A and C of the Listing. Listing 12.03 provides:

A. Medical documentation of one or more of the following:

    1. Delusions or hallucinations;

    2. Disorganized thinking (speech); or

    3. Grossly disorganized behavior or catatonia.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of
mental functioning (see 12.00F):

    1. Understand, remember, or apply information (see 12.00E1).

    2. Interact with others (see 12.00E2).

    3. Concentrate, persist, or maintain pace (see 12.00E3).

    4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is,
you have a medically documented history of the existence of the disorder over a
period of at least 2 years, and there is evidence of both:

     1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

     2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.03.

Both Listings 12.04 and 12.06, which were expressly considered by the ALJ in his decision, have the same framework: a claimant must satisfy either paragraphs A and B or paragraphs A and C. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06. Moreover, paragraphs B and C of Listings 12.04 and 12.06 are identical to paragraphs B and C of Listing 12.03. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.03, 12.04, 12.06. Thus, if a claimant is unable to satisfy either paragraphs B or C of Listing 12.04 or 12.06, he is necessarily also unable to satisfy paragraphs B or C of Listing 12.03.

In this case, the ALJ thoroughly analyzed whether Plaintiff's impairments satisfied paragraphs B and C of Listings 12.04 and 12.06. (R. 19–22.) In addressing the "paragraph B" requirements, the ALJ found that Plaintiff had "moderate limitations" in "understanding, remembering, or applying information," noting that although Plaintiff reported having some difficulties with reading, writing, and comprehension, the record showed "the claimant was able to provide information about his health, comply with treatment outside of a doctor's office or hospital, and there is little mention of any issues with the claimant's short- or long-term memory." (*Id.* at 20.). The ALJ also found Plaintiff had moderate limitations in interacting with others, stating that Plaintiff could "get along with others, spend time with friends and family, and live with his parents." (*Id.*) Third, the ALJ found the claimant had moderate limitation in his ability to concentrate, persist, or maintain pace. (*Id.*) The ALJ noted notwithstanding Plaintiff's self-reported difficulties with concentration, he was able to drive, watch TV, and use the internet.

(*Id.*)  Finally, the ALJ found that Plaintiff had moderate limitations in his ability to adapt or manage himself, noting that despite Plaintiff's reported issues with mood and hygiene, he was able to negotiate a car sale and the record showed no evidence of inappropriate hygiene.  (*Id.*)  In short, the ALJ found that Plaintiff's impairments did not satisfy the "paragraph B" requirements.  (*Id.* at 21.)

Turning to the "paragraph C" requirements, the ALJ found there was no evidence in the record of documented medical treatment for a Listing disorder over a period of two years.  (*Id.*)  Further, there was no evidence of marginal adjustment, or "minimal capacity to adapt to changes in the environment or to demands that are not already part of the claimant's daily life."  (*Id.*)

As discussed above, the paragraph B and C requirements are identical for Listings 12.03, 12.04, and 12.06.  Because the ALJ concluded that Plaintiff did not meet either the paragraph B or C criteria for Listings 12.04 and 12.06, Plaintiff could not have met the paragraph B or C criteria for Listing 12.03.  Accordingly, the undersigned finds that the ALJ did not commit reversible error in neglecting to expressly discuss Listing 12.03.

**B.      The RFC**

Plaintiff contends that the RFC the ALJ assessed was not supported by substantial evidence.  (Pl.'s Statement of Errors at 8–12, ECF No. 7.)  According to Plaintiff, the ALJ improperly weighed the medical opinions and used his own "lay opinion" to create the RFC.  (*Id.* at 8.)  The undersigned will address each of these arguments in turn.

**1.      The RFC is supported by substantial evidence.**

Plaintiff argues that, as a whole, the RFC is not supported by substantial evidence because the ALJ substituted his own "lay opinion" for the medical opinions.  (Pl.'s Statement of Errors at 8–12, ECF No. 7.)

16

The ALJ is charged with the final responsibility for determining a claimant's residual functional capacity.  *See* 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner").  Moreover, the Social Security Act and agency regulations require an ALJ to determine a claimant's residual functional capacity based on the evidence as a whole.  42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i) (incorporating § 423(d) for Title XVI); 20 C.F.R. § 404.1546(c) ("If [the] case is at the administrative law judge hearing level . . . the administrative law judge . . . is responsible for assessing your residual functional capacity.").  As the court recognized in *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222 (N.D. Ohio March 2, 2010), the ALJ is charged with evaluating several factors in determining the residual functional capacity, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony.  *Id.* at *2 (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5P, 1996 WL 374183 (July 2, 1996); SSR 96-8P, 1996 WL 374184 (July 2, 1996)).

An ALJ's RFC assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant non-medical evidence regarding what work a claimant is capable of performing.  SSR 96-5P, 1996 WL 374183 (July 2, 1996).  Social Security Ruling 96-8p instructs that the ALJ's residual functional capacity assessment must be based on all of the relevant evidence in the case record, including factors such as medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, and evidence from attempts to work.  SSR 96-8P, 1996 WL 374184 (July 2, 1996).

Here, the ALJ explained how he reached the RFC, in part, as follows:

[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

17

consistent with the medical evidence and other evidence in the record . . . Perhaps most importantly, the record reveals significant social activities and hobbies that are highly inconsistent with the claimant's hearing testimony, and do not support the degree of mental or physical limitation alleged . . . For example, [Plaintiff] later testified he was able to go to a family reunion last summer, and talk and eat with family he didn't know.  He camped out during the reunion.  He was able to attend "radio meetings" in 2012 and references were made to these meetings after 2016 as well.  He reported he enjoyed kayaking and last went kayaking in the summer of 2017 . . . He reported he had not gotten out much due to weather and lack of money, but not underlying condition.  He reported that he enjoys motorcycle rides, long walks, and tinkering around the garage . . . As for the claimant's mental health limitations, the record does include complaints of ongoing depression, anxiety, and mood problems (with periods of improvement), but mental status examinations were almost entirely normal and the claimant's reported activities suggest far better mental functioning than he alleged.

(R. 23–24.)

The undersigned finds that the RFC the ALJ assessed is supported by substantial evidence.  When making the RFC determination, the ALJ properly considered the record as a whole, including medical evidence, Plaintiff's testimony, and Plaintiff's reported activities of daily living.

Plaintiff argues the RFC is not supported by substantial evidence because the ALJ substituted his own "lay opinion" for the medical opinions in the record.  (Pl.'s Statement of Errors, 8, ECF No. 7).  The Plaintiff contends the "ALJ's RFC is unsupported and based on his own lay opinion and not the substantial evidence of the record."  (*Id.* at 12.)

The ALJ, not medical sources, has the final responsibility for deciding issues like residual functional capacity.  20 C.F.R. § 404.1527(d)(2).  ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.")  The regulations do not require an ALJ to rely solely upon medical opinions when formulating a residual functional capacity, but instead explicitly require an ALJ to evaluate medical opinions based on their consistency with and support from "medically acceptable clinical and laboratory diagnostic

techniques." 20 C.F.R. § 404.1527(c)(2), (3), (4). Indeed, as the Sixth Circuit has held, physician opinions "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 197 (6th Cir. 2004)).

Contrary to Plaintiff's assertions, the ALJ did not impermissibly use his own opinion instead of the medical opinions in the record. Rather, the ALJ properly considered and weighed the opinions and evidence in the record when crafting the RFC. Accordingly, the undersigned finds the RFC is supported by substantial evidence.

Plaintiff further argues that the ALJ improperly weighed the opinions of the state agency reviewers and the consultative examiner. The undersigned addresses both arguments in turn.

### 2. Vicki Warren, Ph.D. and Jennifer Swain, Psy. D., State Agency Reviewers

First, Plaintiff argues that the ALJ should have given greater weight to the opinions of the two state agency reviewing psychologists. (Pl.'s Statement of Errors at 9–11, ECF No. 7.) At the initial level, the state agency psychologist, Vicki Warren, Ph.D., opined that Plaintiff had "limitations in his ability to concentrate and persist in work related activities. Able to complete simple 1–2 step routine tasks that do not require a fast pace or strict production guideline." (R. 115.) She also opined that Plaintiff would "be expected to have limitations in his ability to deal with normal pressures in a competitive work setting. The claimant should be considered unable to manage funds. Able to respond to changes that are communicate[d] in advance, with extra time to adjust." (*Id.* at 116.) At the reconsideration level, Jennifer Swain, Psy. D. concurred

with all of Dr. Warren's opinions and added there were "[n]o changes or new conditions reported" on reconsideration.  (*Id.* at 134.)

Like other medical source opinions, the ALJ must consider state agency medical opinions.  *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or state agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); SSR 17-2p, 2017 WL 3928306 (March 27, 2017), at *4 (noting "[a]lthough adjudicators at the hearings and AC levels are not required to adopt prior administrative medical findings when issuing decisions, adjudicators must consider them and articulate how they considered them in the decision").

The ALJ provided the following discussion of the state agency reviewers' opinions:

> The state agency psychological consultants at the initial and reconsideration level opined that the claimant would be able to complete simple, routine, repetitive 1–2 step instructions; able to complete 1–2 step routine tasks that do not require a fast pace or strict production guideline; superficial interaction only with supervisors, coworkers, and the public; and able to respond to changes that are communicated in advance, with extra time to adjust.  These opinions are generally supported by the bulk of the objective medical evidence in the record, which shows some mental symptoms upon examination, along with a history of complaints of depression, anxiety, and mood difficulties.  However, the claimant's social and recreational activities during the period at issue do support somewhat lesser mental restrictions. The undersigned has thus given the mental opinions some weight, while adjusting some of the language therein to make it compliant with the Act.

(R. 27.)

The undersigned finds no error with the ALJ's consideration and weighing of the state agency reviewers' opinions.  First, the ALJ directly adopted several of the state agency reviewers' opined limitations—namely, that Plaintiff is able to understand, remember, and carry out simple repetitive tasks, that Plaintiff should have only occasional contact with coworkers and

the public, and that Plaintiff can adapt to simple changes.  (*See* R. 22, 115–16, 133–34.)  The

ALJ explained he gave some weight to Dr. Warren's and Dr. Swain's remaining opinions

because they were inconsistent with the record as a whole, specifically because Plaintiff's social

and recreational activities during the alleged disability period supported lesser restrictions.  Thus,

the undersigned finds the ALJ's evaluation of the state agency reviewers' opinions is supported

by substantial evidence.

Plaintiff takes issue with the ALJ's failure to adopt the state agency reviewers' opined

limitations requiring "difficulty maintaining attention and concentration and performing at a

consistent pace without interruptions and difficulty responding appropriately to changes in the

work setting."  (Pl.'s Statement of Errors 10, ECF No. 7.)  Plaintiff contends that the ALJ's

restrictions do not sufficiently account for his "limitations in concentration, persistence, and

pace."  (*Id.*)

The undersigned disagrees that the ALJ was required to adopt the portion of the state

agency reviewers' opinions suggesting greater limitations for concentration, persistence, and

pace.  "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an

ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the

state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x

267, 275 (6th Cir. 2015).  Here, the ALJ found that the record as a whole, and Plaintiff's social

and recreational activities in particular, did not support greater limitations for concentration,

persistence, and pace.  Although substantial evidence may also support an alternative finding, the

ALJ's findings were within the ALJ's permissible "zone of choice," and the Court will not re-

weigh the evidence.  *See Blakley*, 581 F.3d at 406; *see also Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) ("The substantial-evidence standard allows considerable latitude to

21

administrative decision makers.  It presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In short, the undersigned finds that the ALJ's consideration and weighing of the state agency reviewers' opinions was supported by substantial evidence.

### 3.     T. Rodney Swearingen, Ph. D., Consultative Examiner

Plaintiff also contends that the ALJ did not give sufficient weight to the opinion of T. Rodney Swearingen, Ph. D., a consulting examiner.  (Pl.'s Statement of Errors at 10, ECF No. 7.)

Dr. Swearingen performed a consultative examination of Plaintiff on November 10, 2016, after which he diagnosed Plaintiff with Unspecified Intellectual Disability; Major Depressive Disorder, Recurrent, with Psychotic Features; General Anxiety Disorder; and Obsessive-compulsive Disorder.  (R. 520–24.)  Dr. Swearingen opined that Plaintiff "could follow instructions in today's examination," but concluded that Plaintiff had "pervasive limitations in his ability to understand, remember, and carry out one step and complex workplace instruction." (*Id.* at 523–24.)  Dr. Swearingen further opined that Plaintiff's "concentration was adequate in today's examination," but concluded that Plaintiff "would be expected to have pervasive limitations in his ability to concentrate and persist in work related activities.  (*Id*. at 524.)

As a non-treating practitioner, Dr. Swearingen's opinion is not entitled to any particular deference.  Consultative examiners' opinions must be meaningfully evaluated according to the factors set forth in 20 CFR § 404.1527(c), but an ALJ need not give "an exhaustive factor-by-factor analysis."  *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 (S.D. Ohio 2015) (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011)).  Because a consultative examiner usually meets with the claimant only once, they usually do not have an on-

going treatment relationship with the claimant to trigger the deference owed to treating physicians. *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245–46 (6th Cir. 2018) (the absence of an on-going treatment relationship means "the ALJ is entitled to give less weight to the consultative examiner's opinion") (citing *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (2017)).

The ALJ provided the following discussion of Dr. Swearingen's opinions:

> The opinion of psychological consultative examiner, T Rodney Swearingen, Ph.D., is given little weight. Dr. Swearingen opined that the claimant has pervasive limitations in his ability to understand, remember, and carry out one step and complex workspace instructions; would be expected to have pervasive limitations in his ability to concentrate and persist in work related activities; ability to maintain effective social interactions on a consistent and independent basis with supervisors, coworkers, and the public would be expected to be pervasively impacted; and would be expected to have pervasive limitations in his ability to deal with normal pressures in a competitive work setting. While Dr. Swearingen's opinion was made after a thorough evaluation of the claimant, it is not entirely consistent with the longitudinal record including the largely normal mental status examination, and the claimant's significant reported socialization and hobby activities. Moreover, the opinion itself is quite vague as to what specific functional limitations would be expected beyond "pervasive limitations." For these reasons, this opinion is given no more than little weight.

(R. 28.)

The undersigned finds no error with the ALJ's consideration and weighing of Dr. Swearingen's opinion. The ALJ explained he gave little weight to Dr. Swearingen's opinion because it was inconsistent with the record as a whole. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). The undersigned finds that the ALJ's determination that Dr. Swearingen's opinion was largely inconsistent with the record is supported by substantial evidence. For example, Dr. Swearingen stated that Plaintiff "only socializes with the other members in his group counseling," but during his testimony, Plaintiff testified over the past summer he attended a family reunion and generally goes kayaking once or

twice a summer.  (R. 48, 54, 524.)  Further, the ALJ properly gave Dr. Swearingen's opinion little weight because was vague and without specific limitations.  *Myers v. Comm'r of Soc. Sec.*, No. 2:19-CV-2060, 2019 WL 7046408, at *10 (S.D. Ohio Dec. 23, 2019), *report and recommendation adopted*, No. 2:19-CV-2060, 2020 WL 880778 (S.D. Ohio Feb. 21, 2020) (finding the ALJ's decision to afford little weight to a treating provider's vague opinion was supported by substantial evidence); *Mardis v. Comm'r of Soc. Sec.*, No. 2:18-CV-337, 2019 WL 2223071, at *3–4 (S.D. Ohio May 23, 2019) (same).

Finally, the ALJ did not disregard Dr. Swearingen's opinions entirely; instead, he included limitations in the RFC (such as limiting Plaintiff to only occasional public contact and only occasional interaction with coworkers) to account for Dr. Swearingen's findings that the ALJ found to be consistent with the record.  Accordingly, the undersigned finds that the ALJ's evaluation of Dr. Swearingen's opinion is supported by substantial evidence.

## C.     Neuropathy

Finally, Plaintiff argues that the ALJ's finding at step two that Plaintiff's neuropathy was not a severe impairment was not supported by substantial evidence.  (Pl.'s Statement of Errors at 12–14, ECF No. 7.)  The Plaintiff further argues that, even if the ALJ correctly categorized the neuropathy as non-severe, the ALJ failed to properly consider the limitations the neuropathy imposed on Plaintiff when crafting the RFC.  (*Id.* at 13–14.)

At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012).  The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.

24

1988).  The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint."  *Id*. at 863 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985).

However, where the ALJ determines that a claimant has a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003).  Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in the RFC assessment); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

The undersigned finds any error the ALJ may have made in evaluating Plaintiff's neuropathy was harmless.  At step two, the ALJ found that Plaintiff had several severe impairments: kidney failure with history of kidney transplant; hearing loss; fibromyalgia; hypertension; depression; anxiety; and intellectual disorder.  (R. 18.)  Because the ALJ had already determined Plaintiff had these severe impairments, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa*, 73 F. App'x at 803.  Further, the ALJ considered Plaintiff's "ongoing pain complaints" when crafting the RFC.  (R. 26–27.)  Although the ALJ did not use the term "neuropathy," he offered a detailed account of Plaintiff's endorsed symptomatology, namely, his alleged pain:

> With respect to the claimant's fibromyalgia and ongoing pain complaints, [he] alleged chronic, achy pain in his neck, back, and legs during the October 2016

25

consultative examination.  There was constant mild involuntary spasm to inspection and palpitation of the upper trapezius and lumbar musculature with multiple tender trigger points palpated in these muscle groups (in addition to those palpitated in the upper and lower extremities total greater than 11/18 for probable fibromyalgia syndrome).  However, the claimant indicated his pain was better after starting Neurontin in February 2017.

(R. 26)

The undersigned finds that the ALJ properly considered the symptoms and limiting effects Plaintiff alleges flow from physical impairments, including his neuropathy, when crafting the RFC.  *Cf.* 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803.  Significantly, Plaintiff fails to specify what additional limiting effects the ALJ neglected to consider or additional limitations the ALJ should have included in the RFC as a result of his neuropathy.  Moreover, Plaintiff's testimony at the 2019 hearing that he did not know the difference between fibromyalgia and neuropathy weakens the credibility of his argument that his neuropathy required greater accommodations.  (*See* R. 58.)  Accordingly, the undersigned finds that any error the ALJ made in evaluating Plaintiff's neuropathy was harmless.

## VI.    DISPOSITION

In sum, from a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those

26

portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE